Nelson, J.,
delivered the opinion of the Court.
In a power of attorney, executed by complainant on the 19th of December, 1860, authorizing the defendant to sign the name of complainant to a certain deed of partition, it is provided, among other things, as follows: “I, the said Jesse Wood, do hereby further authorize the said John L. Cooper to enter into and take possession of the real estate conveyed to me in the above described *443 deed, and to bargain, sell, grant, convey and confirm tire said land, for such price or sum of money, or on such terms, as he may think best.” The. power also authorizes the attorney in fact to execute deeds of conveyance, with warranty; to rent the land until he can sell it; to demand, receive and collect all sums of money which shall become due and payable by such safe or sales;” to dispose of the rents, and “to do and perform every act and thing whatever, requisite and necessary to be done in and about the premises.”
The tract of land, the sale of which was thus authorized, contained 63f acres, and adjoined a tract of about 90 acres, owned by W. M. Wood, the brother of complainant; and the defendant was also the agent, or attorney in fact, of W. M. Wood. On the 19th of December, 1861, the defendant sold the two tracts to James A. Jarrett, for $3,800, and executed to him a title bond in the names of complainant and W. M. Wood. He took the note of Jarrett for $486, due 25th of December, 1862, in part payment of the purchase money, and notes on other solvent parties, in different amounts, for the residue; none of the notes falling due .at a later date than the 25th of December, 1862. These debts, or the greater part thereof, were collected by the defendant during the year 1862, partly in notes of the South Carolina and Georgia banks, and, in part, in notes on the Bank of Tennessee, and the Union and Planters5 Banks.
Although the number of acres in. the two tracts was different, the smaller tract of complainant was equal in value to the larger tract, belonging to W. M. Wood, and the defendant, therefore, treated each of the owners as *444 being entitled to $1,800 of the purchase money. The defendant also received $150 as rents of said property, of which amount he transmitted $100 to the complainant, and applied the residue to the payment of taxes, and in the purchase of a wagon for the removal to Missouri of the negroes then belonging to complainant and his brother.
The complainant was a citizen of Missouri, .where he executed the power; and he filed his bill on the 28th of February, 1866, in the Chancery Court at Shelbyville, against the defendant, to compel him to account for the tract of land at $35 per acre, and also for the rents, and certain profits alleged to have been made by defendant from a conversion of the fund and certain speculations in which he engaged. The bill treats the fund realized, or which should have been realized, from the sale of the land, as belonging to complainant, and assumes that the title of Jarrett, the purchaser, “is perfect and complete.”
It appears that complainant, being dissatisfied with defendant, appointed W. N. Gwinn attorney in fact, in his stead; and that, in the month of January, 1866, shortly before the bill was filed, defendant made two payments to said agent, amounting to $961.75. The defendant denies that he engaged in any speculation, or realized any profit, upon complainant’s funds, and there is no proof to contradict his denial. It is stated in the answer, and shown in evidence, that, after he received the purchase money, the defendant attempted, during the late civil war, to- communicate with complainant, but found it extremely difficult to do so; and being afraid of depredations by the soldiery, he employed unusual and extra *445 ordinary means to shield the money which he had collected from their discovery. He kept it, generally, between the lids of an old book, from which the leaves had been torn out, and hid the book, at one time, beneath a parlor chair; at another, in his buggy-house; and yet at another, in his book-case and finally) being under great apprehension that the money might be discovered and stolen, he divided his funds, consisting of his own money and the money realized from the sale of the land, and deposited part of it, in May, 1883, with his brother, under the belief that two chances of taking care of it were better than one. His brother also kept the money in a book, and states that at the time Gen. Bragg’s army left the neighborhood, on the approach of the Federal forces, which was about the 17th of June, 1863, he (the witness) owned some cattle, which he wished to keep out of the way of the Federal army; and having heard firing bet',veen them and the Confederate forces after he started from home, and regarding it as uncertain when he could return, he sent his nephew back after his money, and his wife sent him the book just as' it was tied up, not knowing, as he supposes, that complainant’s money was in it. Witness went South, and remained away until November, 1-863, when he returned to Bedford county, and restored to complainant the $800 he had received from him, with the exception that one of the bills returned was a $100 bank note, for which he had exchanged to that amount the $5 Georgia notes which he had received. Witness states that the greater part- of the money he returned was the identical money he had received; and there is no proof that either he or complainant embarked *446 in any speculation whatever. It further appears that Gwinn, the second agent of complainant, sent to complainant $700 of the amount he had collected, in United States Treasury notes, commonly called “greenbacks,” and received a letter from him, acknowledging the receipt thereof, under date of March 14, 1866, after the commencement of this suit.
It is in proof that defendant sold the land for a fair price; and there is no evidence to show that he was limited, by his instructions, to sell for not less than $35 per acre. If such evidence were admissible, which may well be doubted, it would require the clearest and most satisfactory proof to countervail the provision in the written power, that the attorney in fact, was to sell for such price or sum of money, or on such terms, as he might think best.” See Story on Agency, § 198, 4th ed.
There is evidence in the record, tending to show that defendant said, in conversation, he had sent part of the money by his brother, to the South, to trade on, and that he complained of his brother for not returning the money received; and it is also shown that the rents, or their proceeds, were paid to, or realized by, complainant, as stated in the answer.
Thomas II. Cold well proves that “up to about the middle of March, 1862, Southern bank notes were about equal to our best banks in Tennessee, and some persons thought they were better; and William S. Jett, Cashier of the Shelbyville Bank, states that, during the year 1862, and in the early part of 1863, the notes of all Southern banks were in good standing and at par, in the payment of debts due the bank, and that within the period stated, *447 as much as fifty, and possibly one hundred, thousand dollars were received in payment.
It is also in proof, that current b'ánk notes, as compared with gold and silver, were greatly below par; but as the Court may judicially know, “any matters of public history, affecting the whole people,” and “whatever ought to be generally known within the limits of their jurisdiction,” see 1 Greenl. Ev., §§ 5, G, we attach, in this case, but slight importance to this evidence, for the reason that it is generally, and perhaps, universally known, that during the late civil war, gold and silver disappeared entirely, as a circulating medium, in the Southern States, and became the subject of especial contract in the very few instances in which contracts were made as to that species of currency.
From the evidence in this cause, it is impossible to escape the conclusion that the defendant, as attorney in fact, acted with the utmost fairness- and integrity, and more than ordinary caution; for he was far more successful than the masses of the people, during the late civil war, in shielding his own and complainant’s money from the prying scrutiny and thievish cunning of straggling and undisciplined soldiers, who, in innumerable instances, robbed and plundered, without fear and without punishment, the peaceful, unarmed, unresisting, and, far too often, uncomplaining citizen.
It is now insisted, in argument, that the contract made by the agent was unlawful, and incapable of ratification, because the complainant was a citizen of Missouri, and-the agent and purchaser were citizens of Tennessee at the time when the contract for the sale of the land was made; *448 that it was made during the late civil war, and that the power of attorney was revoked by the war, according to the principle established in Conley v. Burson, 1 Heis., 145. To this, it may be answered that the pleadings and proofs in this cause were made up without any reference to that opinion; that the transcript was filed about three years before the opinion was delivered; and although the principle of law was the same at the' commencement of the suit as at present, yet there are no allegations in the bill, or admissions in the answer, upon which the question can be raised.
As part of the history of the United States, and of the late civil war, -we take judicial notice of the fact that Missouri had representatives in the Provisional Congress of the Confederate States, prior to December, 1861, and was admitted into the Southern Confederacy at the fourth session of the Congress of the Confederate States of America, in December, 1861, and had Senators and Representatives in the Congress of the Confederate States until the close of the war: See McPherson’s Hist. Rebellion, 400, 402.
We also judicially know, as part of the history of the country, that fierce battles were fought in the State of Missouri between the armies of the United States and those of the Confederate States; but we do not judicially know the fluctuating lines of those contending armies, and there is nothing in the pleadings or proof in this cause, to show whether the complainant resided within the lines of the Confederate, or within those of the Federal Army, on the 19th December, 1861, when the defendant executed the title bond to Jarrett. We can not, therefore, assume that *449 the contract was illegal, or tbe power of attorney revoked. On the contrary, we are bound to presume that the contract was legal, according to the familiar maxim that “everything is presumed to be. rightly and duly performed until the contrary is shown.” •
It is stated in the answer of defendant, that “in consequence of the war, all practicable means of communicating with complainant in Missouri, were cut off, so that respondent could neither get a letter to him, or the money, although he tried to communicate with him by letter, and saw no opportunity to send him the money, and was obliged to keep it, and insists complainant is bound to receive it.” In the answer of the complainant to defendant’s cross bill, it is admitted that he received two letters from complainant; one of them dated in 1864, in which he was notified of the sale of the land; but while he denies that said letters contained any information as to the payments made 'in current bank notes, he states that he has so lost, or mislaid, the two letters, that he can not find them. Complainant further states, in said answer, that he was in the army up to July, 1865, but does not state when he entered it, or to what army he belonged.
These vague statements in the pleadings do not raise any question as to the supposed illegality of the contract of sale to Jarrett. Assuming, therefore, that the contract with Jarrett was legal and susceptible of ratification, if it needed any, we hold that complainant has fully ratified said contract, not only by filing this bill to recover from his agent the value of the land or the amount of purchase money in “greenbacks,” but by the reception of part of the purchase money as already stated, after he was fully *450 informed of the facts on his visit to Bedford County, in the Fall of 1865. It is well settled that “a principal cannot, of his own mere authority, ratify a transaction in part, and repudiate it as to the rest. He must either adopt the whole or none. And hence, the general rule is deduced that, where a ratification is established as to a part, it operates as a confirmation of the whole of that particular transaction of the agent;” and a ratification made - upon full knowledge of all the material • circumstances, becomes, in that instant, obligatory, and can not afterwards be revoked or recalled: See Story on Ag., § 250, 4th ed., and the eases there cited, Ib., § 251; Shurer v. Green, 3 Cold., 427, 428.
It is next insisted for complainant, that the defendant mixed and blended the money he received with his own money or that of others, so that the same can not now be' identified or delivered in specie, and that he is therefore liable; and in support of this proposition the counsel cites Draper v. Joiner, 9 Hum., 612; Peck v. James, 1 Head, 75, and Mason v. Whitthorne, 2 Cold., 242. There can be no doubt, if the doctrine as to “confusion of goods” is applicable in a case like this, that if an agent acting contrary to instructions or the common usage of trade, wilfully so intermixed the property or funds of his principal with his own, as to produce a confusion of goods, he will be responsible; but if he acts in good fkith, and takes the same care of the fund that he does of his own, and the intermixture is not detrimental to the interests of his principal, no personal responsibility attaches to his act. In Draper v. Joiner, a guardian sold a slave, the property of his ward, at a place different *451 from that specified in the order of the Court, took notes payable to himself, at the rate of ten per cent., delayed a report of the sale two years, until the purchasers became insolvent, and accounted only for six per cent, interest, and he was justly held accountable for his fraud. In Peck v. James, where a County Trustee had received notes oí the Bank of East Tennessee, which failed, it was held that he was bound to establish the identity of the fund, in order to prevent fraud. In Mason v. Whitthorne, it appeared that Whitthorne, who was a Clerk and Master, had received money in that character, and deposited it in his own name in bank; that, as a Director, he had voted to remove the assets of the bank to Chattanooga; that an order was made directing the depositors to draw out their deposits; and that, instead of drawing them, he took from the Cashier a cheek on the Bank of Augusta, Georgia, and on presenting' the same, was answered that they had no funds of the Branch Bank of Tennessee at Shelbyville. In that case, it was held that, “by mingling the trust fund with his own money, and depositing the same in the bank, in his own name and to his own private account, to say nothing of his participation in the removal of the assets of the bank, or his failure to withdraw his deposits, upon notice from the bank, and the acceptance of a check in lieu thereof; he treated the money as his own.” But, in the case under consideration, there were .no acts of ownership, no disobedience of any instructions established by proof, no fraud, and no especial profit or advantage to the defendant. It is remarkable that he was able to keep the fund at all, during the prevalence of the most rigid *452 and annoying practices of war. The ' principles applied to a confusion of goods are inapplicable to a case like this. When a wrong-doer intermixes his corn or hay, wilfully, with that of another, so that it becomes impossible to distinguish what belongs to each, the whole belongs to him whose property was invaded; but if the goods can be easily distinguished and separated, no change of property takes place: 1 Kent, 6th ed., 365. So it is, in many’ cases, the duty of an agent to keep the property of his principal separate from his own, and not to mix it with the latter; and if he does not keep it separate from his own, in cases where it is properly his duty, and afterwards he is unable to distinguish between the one and the other, the whole will, as a sort of penalty for his negligence, be adjudged to belong to his principal: Story on Ag., 1th ed., § 205. But this rule is generally applied only in eases of fraud and gross negligence: 1 Story’s Eq., § 623; lb,, § 469. It usually embraces ordinary articles of personal property, to which some specific value is attached, and is not applicable to current bank notes, issued by the same banks, which are ordinarily of the same value, and as to which any damages resulting from their appropriation can be readily ascertained. In the case before us, the defendant states that he received in payment for the land, or of the notes which he took for purchase money, bank notes on the banks of several States named in his answer. He names the persons, from whom he received them, but states, distinctly, that he “laid the money away for complainant, keeping it separate and apart from his own;” and although he may have kept it in the same book *453 with his own funds, and some “confusion” may have resulted from his placing part of it in the hands of his brother for safe keeping, yet it is a sound legal principle, that “extrao dinary emergencies may arise, in which a person who is an agent, may, from the very necessities of the case, be justified in assuming extraordinary powers; and his acts, fairly done under such circumstances, will be binding upon his principal:” Story on Ag., § 141. The delivery of the money to his brother for safe keeping, was an act of precaution justified by the circumstances; and the éxchange by him of smaller notes for larger ones, so as to reduce the bulk of the funds he carried about his person, and to enable him to keep them more securely, was a prudential measure, extremely necessary to the safe keeping of the fund in a time of war and general robbery.
In Crutchfield v. Robins, Tingley & Co., 5 Hum., 17, it was held that a payment of an execution to a Sheriff, in current bank paper, was a payment in money; and we hold that, as the agent was not limited by the power, to gold and silver, or any particular kind of money, and was authorized to sell “on such terms as he might think best,” he had the right to receive current bank notes, which were, at the time he received them, the best currency in circulation, and, as the proof shows, were received at the time by the banks, and treated as “par” in all ordinary transactions.[1] The general doc *454 trine, as stated in Shurer v. Green, 3 Cold., 426, should be tbus qualified. The Chancellor’s decree is, therefore, affirmed, with the modification that the agent having acted in good faith, is entitled to the ordinary compensation for his services, and will not be charged with interest unless he actually received it. Complainant will pay the costs in this Court.
Let the case be remanded for an account.
On the 21st day of January, the following additional opinion was delivered:
In this case, upon the suggestion of counsel for complainant, we agreed to reconsider so much of the former opinion as declares that the defendant, who did not appeal from the judgment, should be entitled to compensation for his services as agent. The opinion, on this point, was founded upon the cases in which it has been held that an appeal in equity brings up the whole case. See Morris v. Richardson, 11 Hum., 392; Maskall v. Maskall, 3 Sneed, 209, 210; Furber v. Carter, 2 Sneed, 2; Whiteside v. Hickman, 2 Yer., 358; 4 King’s Tenn. Dig., 229, § 11264.
The appeal in Chancery is regulated by the Code, sections 3155, 3159, and the appeal in the nature of a writ of error by 3172. Section 3155 authorizes a reexamination of the whole matter of law and fact appearing in the record. Section 3159 allows any one or more of the parties to appeal, “the judgment remaining in full force against such of the parties as do not appeal.”
In Gilchrist v. Cannon, 1 Cold., 590, it is said that *455 the proceedings in a cause may, in their nature, be divisible, or the same suit may contemplate different objects.” Construing 3155 and. 3159 together, we are of opinion that it was competent for the complainant to have prayed an appeal from that part of the decree, only, with which he was dissatisfied; but as he prayed a broad appeal from the entire decree, his appeal brought up the entire cause, and did not leave the judgment in force as to the defendant not appealing. There are many cases where there are separate and distinct judgments as to different defendants; and the intention of the statute was to cover such cases, where the interests of defendants are different; not cases like this, where the gravamen of the bill relates to a single subject of agency, and no part of the duties or liabilities of the agent could be brought under' review here without considering the whole subject. In Ross v. Ramsey, 3 Head, 15, it was held that a pro confesso upon a bill which makes no case against a defendant will not support a decree. See, also, 3 Yer., 373. As the complainant brought up the entire cause, and it is manifest that the Chancellor erred in not allowing compensation to a faithful agent for his services, and as- it will be indispensable to take an account, he should' not be held to have abandoned his right to compensation by not appealing.

 In Dietz v. Mitchell, January 18, 1871, this doctrine was approved as to debts due to an executor, which the debtor insisted on paying, received in Southern bank notes, when they were the best currency in circulation, and the choice was between them and Confederate notes; and also, as to other debts collected in Southern bank notes, which it did not appear were pressed upon the executor.